The **MUNCHAK CORPORATION** and RDG Corporation, a joint venture d/b/a the Carolina Cougars, Plaintiffs,

v.

William John CUNNINGHAM, Defendant.

No. C–96–G–71.

United States District Court, M. D. North Carolina, Greensboro Division.

Sept. 24, 1971.

William Zuckerman, of Forman & Zuckerman, Greensboro, N. C., and

Frank Love, Jr., of Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiffs.

Bynum M. Hunter, and Herbert O. Davis, of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiffs, The Munchak Corporation and RDG Corporation, a joint venture d/b/a The Carolina Cougars, seek by this action to enjoin the defendant, William John Cunningham, from performing services as a professional basketball player for any professional basketball team other than The Carolina Cougars for the term of alleged contracts he signed with the plaintiffs on August 5, 1969, which said contracts obligate the defendant to perform services for the plaintiffs as a professional basketball player for three years, beginning October 2, 1971. Jurisdiction is based on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332(a)(1).

The matter has been submitted to the Court for consideration and decision on the pleadings, stipulated facts and exhibits, depositions and briefs, and argument of counsel.

After giving due consideration to this stipulated record, briefs and arguments, the following facts are found:

### FINDINGS OF FACT

1. The plaintiff, The Munchak Corporation, is a Delaware corporation, domesticated and authorized to transact business in North Carolina. The plaintiff, RDG Corporation, is a North Carolina corporation with its principal place of business in Greensboro, North Carolina. The corporate plaintiffs own and operate as a joint venture a professional basketball team franchise of the American Basketball Association under the name of The Carolina Cougars. The plaintiffs are hereinafter collectively referred to as the "Cougars."

2. The defendant, William John Cunningham, is a citizen and resident of the State of Pennsylvania.

3. During most of the period herein referred to, the Cougars were owned by Southern Sports Corporation, a North Carolina corporation. However, during the early part of 1971, the assets of Southern Sports Corporation were sold to The Munchak Corporation and RDG Corporation, and Southern Sports Corporation was liquidated. Among the assets acquired by The Munchak Corporation and RDG Corporation were the contracts with the Cougars which defendant Cunningham executed on August 5, 1969. In acquiring the assets of Southern Sports Corporation, The Munchak Corporation and RDG Corporation also assumed the liabilities of Southern Sports Corporation.

4. The defendant Cunningham is a basketball player of special, exceptional, and unique knowledge, skills and ability.

5. In 1965, Cunningham entered into contracts to play professional basketball for the Philadelphia 76ers of the National Basketball Association for the years October 1, 1965, through October 1, 1966, and October 1, 1966, through October 1, 1967.

6. On June 13, 1967, Cunningham entered into three separate one-year contracts under which he contracted to play professional basketball for the Philadelphia 76ers for the years October 1, 1967, through October 1, 1968, October 1, 1968, through October 1, 1969, and October 1, 1969, through October 1, 1970. The contract covering the period from October 1, 1969, until October 1, 1970, provided for compensation in the sum of $40,000.00, and Paragraph 24 of said contract provided:

"24. On or before September 1 next following the last playing season covered by this contract and renewals and extensions thereof, the Club may tender to the Player a contract for the next succeeding season by mailing the same to the Player at his address shown below, or if none is shown, then at his address last known to the Club.

874

If the Player fails, neglects or omits to sign and return such contract to the Club so that the Club receives it on or before October 1st next succeeding, then this contract shall be deemed renewed and extended for the period of one year, upon the same terms and conditions in all respects as are provided herein, except that the compensation payable to the Player shall be the sum provided in the contract tendered to the Player pursuant to the provisions hereof, which compensation shall in no event be less than 75% of the compensation payable to the Player for the last playing season covered by this contract and renewals and extensions thereof."

7. During May or early June of 1969, negotiations began between the Cougars and Cunningham. These negotiations started by Mr. Gardner, then President of Southern Sports Corporation, asking Dean E. Smith, Coach of the University of North Carolina Basketball Team and coach of Cunningham during his collegiate basketball playing career, whether he thought Cunningham might be interested in playing professional basketball for the Cougars. Mr. Gardner and Mr. Smith both knew that Cunningham was under contract with the Philadelphia 76ers of the National Basketball Association. Smith told Gardner that Cunningham was an outstanding young man and would be a tremendous asset to any professional basketball team. Gardner asked Smith to call Cunningham to see if he would be interested in playing for the Cougars. Cunningham's response was that he might be interested in returning to North Carolina and playing for the Cougars. This message was relayed to Gardner, whereupon Gardner asked Smith to have Cunningham to call him, rather than for him to have to make the first contact. Smith again called Cunningham and requested that either he or his representative contact Gardner. In response to said call, Sheldon M. Bendit, one of Cunningham's lawyers, contacted Gardner and commenced the negotiations.

8. On August 5, 1969, the Cougars entered into contracts with Cunningham to play professional basketball for the Cougars for a period of three years, commencing on the 2nd day of October, 1971. For the first year of the contracts Cunningham was to receive a salary of $100,000.00, for the second year a salary of $110,000.00, and for the third year a salary of $120,000.00. Additionally, Cunningham was to receive $125,000.00 as a bonus for signing the contracts. There were also other fringe benefits.

9. At the time the Cougars entered into the contracts with Cunningham on August 5, 1969, the Cougars were fully aware of the fact that Cunningham was under contract to play for the Philadelphia 76ers until October 1, 1970, and that Philadelphia had an option to his services from October 1, 1970, until October 1, 1971.

10. The $125,000.00 bonus was payable $45,000.00 on August 5, 1969, the date of the contract, and the balance of $80,000.00 was evidenced by a promissory note wherein the Cougars promised to pay Cunningham the said sum not later than May 15, 1970.

11. On May 13, 1970, Cunningham sent a telegram to the Cougars advising that the $80,000.00 note would be due and payable on May 15, 1970, and that his attorney, William C. Ragals, Jr., would appear in Greensboro on that date and present said note for payment. The note was presented on the day specified, but payment was refused by the Cougars.

12. Meanwhile, on May 14, 1970, Charles E. Dameron, attorney for the Cougars, wrote Cunningham to the effect that the $80,000.00 was only to guarantee that Cunningham would receive as much as $80,000.00 for the 1970–71 season, and that if Cunningham chose to sit out the 1970–71 option year the $80,000.00 was to be paid, and that

if he chose to play the option year the $80,000.00 note was to guarantee that his total compensation would be at least $100,000.00. In other words, Mr. Dameron expressed the understanding that the amount due on said $80,000.00 note could only be determined after Cunningham decided whether or not he would play for the 76ers during the 1970–71 basketball season, and, if so, the amount of his compensation.

13. Cunningham testified that if the $80,000.00 was paid on the date specified, it was his intention not to play for the 76ers during the 1970–71 season, and to honor his contracts with the Cougars.

14. On May 25, 1970, Sheldon M. Bendit, an attorney for Cunningham, wrote the Cougars that because of their failure to pay said $80,000.00 note when due, the Cougars had breached the terms of their contracts dated August 5, 1969, and that Cunningham deemed said contracts to be void and no longer binding on either of the parties. Enclosed in the letter was a check in the amount of $45,000.00, which had been paid to Cunningham as a part of the bonus specified in his contracts. Bendit also advised the Cougars that Cunningham would return the premiums the Cougars had paid on certain policies of insurance.

15. On June 3, 1970, Dameron, as attorney for the Cougars, advised Bendit that the Cougars considered its contracts with Cunningham, dated August 5, 1969, to be in full force and effect, and that if Cunningham breached the contracts the Cougars would "take immediate legal action to protect [its] interests." The $45,000.00 received from Cunningham was returned to him with this letter.

16. On July 15, 1970, Cunningham entered into contracts with the Philadelphia 76ers covering the 1970–71, 1971–72, 1972–73, 1973–74 and 1974–75 seasons. As compensation for his services, the Philadelphia 76ers contracted to pay to Cunningham a salary of $225,000.00 for the 1970–71 season, and a like amount for each successive season through 1974–75. The contracts also provided for a bonus in the sum of $50,000.00, and certain other fringe benefits.

17. Cunningham has advised the Court and the Cougars that he stands ready, able and willing, to return to the Cougars the sum of $45,000.00 paid to him as a part of the bonus specified in his contracts of August 5, 1969, and any other expenses the Cougars had incurred in connection with the signing of said contracts.

## DISCUSSION

The sole question presented for decision is whether the plaintiffs are entitled to an injunction restraining Cunningham from playing professional basketball with any team other than the Cougars for the term of the contracts he signed with the Cougars on August 5, 1969. Jurisdiction is not questioned, and the fact that Cunningham possesses special, exceptional and unique knowledge, skill and ability as a basketball player is conceded.

One of the most fundamental principles of equity jurisprudence is the maxim that "he who comes into equity must come with clean hands." 2 Pomeroy, Equitable Jurisprudence §§ 397 and 398 (5th Ed. 1941); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Mas v. Coca Cola Co., 163 F.2d 505 (4th Cir. 1947); Minnesota Muskies, Inc. v. Hudson, 294 F.Supp. 979 (M.D.N.C.1969).

Measured by this maxim, the conclusion is inescapable that the Cougars, in its dealings with Cunningham, soiled its hands to such an extent that the injunctive relief sought should be denied.

On June 13, 1967, Cunningham, an adult with four years of university education, freely and voluntarily executed a contract to play professional basketball with the Philadelphia 76ers through October 1, 1970, with the provision that the 76ers might renew its last contract for successive basketball seasons under certain prescribed conditions. While the

so-called "reserve clause" in his contract,[1] if strictly construed in the form written, might be of doubtful validity, the Cougars concede that it effectively gave the 76ers a valid option to Cunningham's services for the 1970–71 basketball season. With the record Cunningham had established as a professional basketball player, neither Cunningham nor the Cougars had any reason to doubt that the option would have been exercised.

Rather than to contact Cunningham while still under contract with Philadelphia, the Cougars chose to make contact through Coach Smith. There is credible evidence in the record to support a finding that this method of contact was purposely chosen so that the Cougars could not later be charged with violating the clean hands doctrine. After Cunningham had expressed some interest in playing with the Cougars, Coach Smith was requested to again contact Cunningham and have him or his agent make the first contact with the Cougars. The Court has no difficulty whatever in finding that the contacts with Cunningham by Coach Smith were contacts by the Cougars to the same extent as if the Cougars had actually made the contacts directly. The Cougars not only paid Cunningham a cash bonus of $45,000.00 for signing the contracts, but agreed to pay him an additional $80,000.00 if he chose to sit out the 1970–71 season by repudiating the option held by Philadelphia and not playing for anyone. The interference with Cunningham while still under contract with the 76ers, and the offer to pay him $80,000.00 to sit out the option year, are sufficient for a court of equity to refuse relief.

■ Even if the Philadelphia 76ers, which is not a party, or the defendant Cunningham, were guilty of improper conduct, this would not aid the plaintiffs. The doors of a court of equity are closed to one tainted with unfairness or injustice relative to the matter in which he seeks relief "however improper may have been the behavior of the defendant." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). Thus, it is irrelevant that the conduct of the 76ers or Cunningham may have been as reprehensible as that of the Cougars since it was the devious conduct of the Cougars that created the problems presented by this litigation.

There is another factor that makes the contracts unenforceable by the Cougars. When the $125,000.00 bonus was agreed upon on August 5, 1969, Cunningham wanted the entire bonus paid in cash at that time. The Cougars wanted to defer payment of $80,000.00 until the latter part of 1969. After negotiations a compromise was reached whereby the $80,000.00 note was unconditionally payable on May 15, 1970, and the language used in drafting the note was plain, complete and unambiguous. The Cougars contend that the note was not to be paid until it was learned whether Cunningham would play for the 76ers during the option year, and if so the amount of compensation he would receive for his services. The Court finds difficulty in believing that this was the true intention of the parties for the reason that Cunningham had until October 1, 1970, to make a decision with respect to the option year. In any event, Cunningham testified, and the Court finds his testimony to be credible, that it was his intention not to play for the 76ers during the 1970–71 season, and to honor his contracts with the Cougars, if the $80,000.00 had been paid on May 15, 1970, the date it was due and the date it was presented for payment. The Cougars having been guilty of a material breach of the contracts, performance by Cunningham was no longer required.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and of the subject matter.

---

1. Paragraph 24 of the contract covering the period from October 1, 1969, to October 1, 1970.

2. The plaintiffs are not entitled to the injunctive relief sought.

Accordingly, a judgment will be entered dismissing the complaint with prejudice.