The **MUNCHAK CORPORATION** and
RDG Corporation, a joint venture d/b/a
The Carolina Cougars, Appellants,

v.

William John **CUNNINGHAM**, Appellee.

No. 71-1984.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 7, 1972.

Decided April 5, 1972.

—◆—

William Zuckerman, Greensboro, N. C. (Forman & Zuckerman, Pros. Atty., Greensboro, N. C., Frank Love, Jr., Randall L. Hughes, and Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., on brief) for appellants.

Bynum M. Hunter, Greensboro, N. C. (Herbert O. Davis, and Smith, Moore, Smith, Schell, & Hunter, Greensboro, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER, Circuit Judge, and CHAPMAN, District Judge.

WINTER, Circuit Judge:

Plaintiffs, the owners and operators of the basketball club "The Carolina Cougars" (the "Cougars"), sued to enjoin defendant, William John Cunningham ("Cunningham"), a professional basketball player, from performing services as a basketball player for any basketball club other than the Cougars in violation of a contract between the Cougars and Cunningham. The district court, finding that Cunningham had contracted to play for the Cougars, nevertheless concluded that even if Cunningham had failed and refused to perform his contract, plaintiffs had unclean hands and had breached their contract with Cunningham. It, therefore, denied injunctive relief.

In this appeal, we conclude that plaintiffs did not have unclean hands, that any breach of contract on the part of plaintiffs was too insubstantial to justify the denial of injunctive relief, and that Cunningham's additional argument that his contract was not assignable is lacking in merit. Accordingly, we reverse and remand the case for entry of an injunction restraining Cunningham from playing for any team other than the Cougars, for the duration of his contract with that club.

I

The district judge made detailed findings of fact to support his opinion and conclusions of law that plaintiffs were not entitled to injunctive relief, Munchak Corporation v. Cunningham, 331 F.Supp. 872 (M.D.N.C.1971), and, consequently, we need not repeat all of the facts. It suffices to say that Cunningham is a basketball player of special, exceptional, and unique knowledge, skills and ability. For the period October 1, 1969, until October 1, 1970, as well as for four earlier seasons, he had contracted to play professional basketball for the Philadelphia 76ers. For the period October 1, 1969, to October 1, 1970, Cunningham received $40,000.00 compensation under the contract, together with a bonus of $15,000.00, a total of $55,000.00. The contract contained a "reserve clause," which gave that club the right, on or before September 1, 1970, to tender a contract to Cunningham to play the next season. If Cunningham failed, neglected or omitted to sign the tendered contract and to return it by October 1, 1970, the existing contract would be continued for another year, but at the rate of compensation fixed in the tendered contract, provided that that compensation was not less than 75% of the compensation being paid Cunningham under the contract then in force.

During May or early June of 1969, the Cougars, with knowledge that Cunningham was under contract with the Philadelphia 76ers, and that that club had an option to Cunningham's services for the 1970–71 basketball season, through intermediaries, entered into contract negotiations with Cunningham. On August 5, 1969, the negotiations ripened into a three-year contract *commencing on the 2nd day of October, 1971.* For the first year of the contract Cunningham was to

receive a salary of $100,000.00, for the second year $110,000.00, and for the third year $120,000.00. Additionally, Cunningham was to receive $125,000.00 as a bonus for signing the contract. The bonus was payable $45,000.00 on August 5, 1969, and the balance of $80,000.00 was evidenced by a promissory note wherein the Cougars promised to pay Cunningham $80,000.00 not later than May 15, 1970. The contract contained a provision which recited that Cunningham had special, exceptional and unique knowledge, skill and ability as a basketball player, the loss of which was not readily translatable into money damages; and, therefore, Cunningham agreed that the Cougars could enjoin him from playing basketball for another team during the term of his contract with the Cougars. The validity and enforceability of this provision in a proper case is not disputed. The litigation revolves about whether Cunningham has meritorious defenses to obviate plaintiffs' equitable remedy.

It is conceded that there was a parol agreement between the parties with respect to the payment of the note. It is undisputed that the note would be cancelled if Cunningham elected to play for the 76ers during his option year for an amount in excess of a certain sum, variously mentioned as $80,000.00 and $100,000.00. If he agreed to play for less than $80,000.00, the note was payable to the extent necessary to make up the difference between the salary with the Philadelphia 76ers and $100,000.00. If he decided not to play with the Philadelphia 76ers during his option year, then the note was to be paid in full. Thus, if we accept the testimony that the note was cancellable if the 76ers paid Cunningham at least $80,000.00, the note provided an incentive for Cunningham—to the maximum extent of $20,000.00—to play for the 76ers if they paid him less than $80,000.00; and if we accept the testimony that the note was cancellable if the 76ers paid him at least $100,000.00, then the note provided an even greater incentive for Cunning-

ham to play. We do not undertake to resolve this factual dispute or to remand the case to the district court for this purpose, because we think it makes no difference in the result which we should reach.

There is a dispute as to how Cunningham had to "elect" to play with the Philadelphia 76ers in order for the note to be cancelled, and the district court made no finding with regard to this provision of the parol agreement. Cunningham testified that the election was by signing a formal contract, but the Cougars' representative testified that if Cunningham reached an agreement to play for the Philadelphia 76ers and earned more than $80,000.00 the note was to be marked cancelled and returned to the Cougars. In fact, Cunningham orally agreed, prior to May 15, 1970, to play for the 76ers for the 1970–71 season at a salary of $225,000.00, but this agreement was not reduced to a formal contract because of some difficulty about the 76ers' providing for disability insurance. It was later supplanted—after May 15, 1970—by a formal contract by and between Cunningham and the 76ers at the same salary, but for a three-year period, and other benefits.

Cunningham, through his representatives, demanded payment of the note on May 15, 1970, but the Cougars resisted payment, claiming that the amount due on the note could only be determined after Cunningham decided whether or not he would play for the 76ers during the 1970–71 basketball season and, if so, the amount of his compensation. At trial Cunningham testified, by deposition, that if the $80,000.00 had been paid on May 15, 1970, it was his intention not to play for the 76ers during the 1970–71 season.

When payment was not forthcoming on May 15, Cunningham, through his representatives, advised the Cougars that his contract had been breached and that he considered it to be void and no longer binding on either of the parties. He tendered the return of $45,000.00, which had been paid him the previous

August. The tender was refused by the Cougars and that club asserted that the contracts were in full force and effect and legal action would be instituted to enforce them. On July 15, 1970, Cunningham entered into contracts with the Philadelphia 76ers covering the basketball seasons of 1970–71, 1971–72, 1972–73, 1973–74, and 1974–75. For the 1970–71 season Cunningham was to be paid a salary of $225,000.00, and a like amount for each successive season, together with a bonus of $50,000.00 for the first year, and certain other fringe benefits.

## II

The principal reason why the district court refused equitable relief was that "the conclusion is inescapable that the Cougars, in its dealings with Cunningham, soiled its hands to such an extent that the injunctive relief sought should be denied." 331 F.Supp. at 875. The unclean hands were found in the fact that the Cougars negotiated with Cunningham through intermediaries and agreed to pay him $80,000.00 if he did not play for the 76ers during his option year. We disagree.

■ In agreement with Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472 (9 Cir. 1969), we think that there was neither illegality nor unclean hands in the Cougars' contracting for Cunningham's services to be rendered *after* the term of his contract with the 76ers had expired, notwithstanding that the negotiations, whether directly or through intermediaries, took place while Cunningham's contract with the 76ers was still in full force and effect. As the *Washington Capitols* case stated, quoting from Diodes, Inc. v. Franzen, 260 Cal.App.2d 244, 67 Cal. Rptr. 19, 26 (1968), " 'no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action.' " Cunningham was under no obligation, option or restraint with respect to the 76ers after October 1, 1971, and the Cougars had a lawful right to bid and contract for his services to be rendered after that date.

Nor do we think that there was illegal inducement or unclean hands in the agreement to pay $80,000.00. As we have stated, the note was to be cancelled only if the 76ers agreed to pay Cunningham more than a certain sum—$80,000.00, testified to by Cunningham's representative and $100,000.00, according to a Cougar representative. But unless the 76ers agreed to pay at least that sum, the note was payable in whole or in part to the extent necessary to enlarge Cunningham's total compensation to $100,000.00. Thus, the giving of the note was an incentive to Cunningham to perform his contract with the 76ers, not a tortious interference with the performance of his contract. Of course, the note was payable in full if Cunningham "sat out" his option year with the 76ers, but Cunningham already had this right since he could not be required to render personal services against his will. The incentive the note provided—to a maximum of $20,000.00 over the amount payable if he did not play—substantially diminished the likelihood that he would exercise this right.

As a second ground for refusing equitable relief, the district judge assigned the Cougars' failure to pay the note when payment was demanded on May 15, 1970. If Cunningham's testimony that his oral agreement, later superseded, to play for the 76ers for $225,000.00, made prior to May 15, did not constitute an "election" to play so as to effect a cancellation of the note, is accepted, then it follows that the Cougars breached their contract with Cunningham when the note was not paid on the date demanded. But we do not think that it follows that Cunningham thereby acquired the right to void his contract, that he was a free agent to contract with the 76ers for the period he had already contracted for with the Cougars, and that equitable enforcement of the

Cougar contract should have been denied.

■ It is undisputed that the note was not payable in all events; nor did the Cougars refuse payment in all events. The conclusion is inescapable that the note was payable in whole or in part dependent upon what salary agreement was made between Cunningham and the 76ers for the 1970–71 basketball season. From the undisputed facts we know that on July 15, 1970, Cunningham made a contract for the option year at a salary in excess of $100,000.00, the largest amount that any witness stated was the sum which would effect cancellation of the note. When it became public knowledge that Cunningham and the 76ers had reached substantial agreement on a $225,000.00 contract, the Cougars knew that payment of the note either would be obviated, or, if made, refunded. Indeed, in the light of what actually occurred, Cunningham in his testimony freely conceded that even if the Cougars had paid the note on May 15, 1970, he would have been obliged to refund that sum after July 15, 1970. We do not think that the Cougars should be penalized for acting in response to reality. Equity does not require the doing of a futile act as a condition to the granting of equitable relief. School Board of City of Charlottesville, Va. v. Allen, 240 F.2d 59, 64 (4 Cir. 1956), cert. den., School Bd. of Arlington County v. Thompson, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957). In any event, we do not think that the Cougars' refusal to pay on May 15, 1970, was such a consequential breach that enforcement of the contract should be denied. Hamlet Ice Co. v. J. A. Jones Const. Co., 194 N.C. 407, 139 S.E. 771 (1927); Moss v. Best Knitting Mills, 190 N.C. 644, 130 S.E. 635 (1925); United States for Use of Wadeford Electric Company v. E. J. Biggs Const. Co., Inc., 116 F.2d 768 (7 Cir. 1940).

### III

Cunningham's contention that his contract was not assignable and that by reason of a purported assignment he is excused from performance arises from these facts. Cunningham's contracts with the Cougars were made at a time when Southern Sports Corporation, owned and operated primarily by James C. Gardner, was the owner of the Cougars' franchise. His contract with Southern Sports Corporation prohibited its assignment to another "club" without his consent, but it contained no prohibition against its assignment to another owner of the same club. In 1971, Southern Sports Corporation assigned its franchise and Cunningham's contracts to the plaintiffs, who, as joint venturers, operate the franchise. Cunningham was not asked to consent, nor has he consented, to this assignment. While Cunningham's contracts require him to perform personal services, the services were to the club.

■ We recognize that under North Carolina law the right to performance of a personal service contract requiring special skills and based upon the personal relationship between the parties cannot be assigned without the consent of the party rendering those services. Peasley v. Va. Iron, Coal & Coke Co., 5 N.C.App. 713, 169 S.E.2d 243, 247 (1969). But, as discussed in 3 S. Williston, Contracts, § 412, at 30–33 (3rd Ed. W. Jaeger 1960), some of such contracts may be assigned when the character of the performance and the obligation will not be changed. To us it is inconceivable that the rendition of services by a professional basketball player to a professional basketball club could be affected by the personalities of successive corporate owners. Cf. Washington Capitols Basketball Club, Inc. v. Barry, supra, 419 F.2d at 479. Indeed, Cunningham had met only Gardner of Southern Sports Club, and had not met, nor did he know, the other stockholders. If Gardner had sold all or part of his stock to another person, Cunningham could not seriously contend that his consent would be required.

■ The policy against assignability of certain personal service contracts

is to prohibit an assignment of a contract in which the obligor undertakes to serve only the original obligee. Williston, supra, § 421 at 32; 4 A. Corbin, Contracts, § 868 at 466 (1951). This contract is not of that type, since Cunningham was not obligated to perform differently for plaintiffs than he was obligated to perform for Southern Sports Club. We, therefore, see no reason to hold that the contract was not assignable under the facts here.

For the reasons stated, we reverse the judgment of the district court and remand the case for entry of appropriate equitable relief.

Reversed and remanded.