**WORLD FOOTBALL LEAGUE, Appellant,**

v.

**DALLAS COWBOYS FOOTBALL CLUB, INC., Appellee.**

No. 18411.

Court of Civil Appeals of Texas, Dallas.

June 24, 1974.

Rehearing Denied July 25, 1974.

David J. Beck, Fulbright & Crooker, Houston, for appellant.

Marshall Simmons, Jenkens & Gilchrist, Dallas, for appellee.

BATEMAN, Justice.

This is an interlocutory appeal from a temporary injunction. Although numerous defendants were named in the petition, the temporary injunction was ordered only against the appellant World Football League ("WFL"), and it was temporarily enjoined "from [1] directly or indirectly entering into any oral or written contracts with any football players now under contract with the [appellee] Dallas Cowboys Football Club, Inc. [the "Club"] to perform services as football players in the World Football League, or [2] from inducing or attempting to induce any such football players under contract with the Dallas Cowboys Football Club, Inc. to engage in promotional, commercial or advertising activities for the World Football League or anyone acting in its behalf."

The Club owns a professional football team known as the Dallas Cowboys. It alleged that it had contracted for and owned the services of certain professional football players and that WFL had induced and would continue to induce some of those players to breach their contracts with the Club by entering contracts to play professional football for teams franchised by WFL after the expiration of their con-

tracts with the Club. The Club also alleged that WFL had induced and would continue to induce certain Cowboy players to engage in promotional activities for WFL while under contract with the Club.

■ By its fifth point of error WFL says the trial court erred in granting appellee temporary injunctive relief because there is no evidence, or in any event insufficient evidence, to support a finding that the Club has a probable right to injunctive relief or will suffer probable harm unless a temporary injunction is issued. The ultimate question in reviewing an order granting a temporary injunction is whether the trial court abused its discretion in granting it. Texas Foundries, Inc. v. International Molders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460, 462 (1952).

The cause of action alleged by the Club was one sounding in tort; i. e., engaging in a concerted program and course of conduct to obtain players for WFL by directly, intentionally and tortiously interfering with the contractual relationships existing between the Club and its players, and also in encouraging, soliciting and inducing players under binding contracts with the Club to breach those contracts and sign contracts with WFL, and to engage in promotional activities for WFL prior to the expiration of their contracts with the Club. We have searched the statement of facts carefully and find no evidence therein that WFL has been guilty of, or has threatened, any of the tortious conduct alleged in the Club's pleadings.

It appears from the undisputed evidence that WFL is a newly organized professional football league, issuing franchises to local professional football teams in approximately twelve places in the United States and Canada. The "Club" is franchised by the National Football League. Calvin Hill, Craig Morton and Mike Montgomery have for several years been among the better players of the Club. Each of them had a separate written contract by which he

agreed to play professional football for the Club for certain designated compensations and for a certain period, usually of two years, with an option to the Club to renew for an additional period of one year at a rate of compensation equal to ninety percent of the "base salary" specified in the contract. This latter year is known as "the option year." Each contract year is from May 1 until the following April 30. Hill, Morton and Montgomery are in the "option years" of their respective contracts, that is, in each case, the year beginning May 1, 1974. Each of these three players, in the month of April 1974, signed a written contract to play for one of the franchised teams of WFL. The Club complains bitterly of this so-called "raiding" of its ranks of good players.

■ In December 1973 or January 1974, a form of letter was written on the letterhead of WFL, signed R. Steven Arnold, "W.F.L. Organizer," and addressed to and received by a substantial number of the Club's players, substantially as follows:

Dear Player:

The World Football League will begin play in 1974 with franchises in twelve areas, including New York, Chicago, Detroit, Toronto, New England, Southern California, Hawaii, and Florida. The remaining franchises will be awarded from some twenty applications for membership under consideration.

It is the intention of the World Football League to be "Major League" in every way, particularly in signing the top professional players available. We feel strongly that every player should honor his present contractual obligation. However, we would very much like to talk with you about the possibility of joining our League at the expiration of your present contract.

In order for us to know your status and to contact you, please fill out and return the enclosed post card as soon as possible.

Wishing you a Merry Christmas and a Happy and Prosperous New Year!

Enclosed with that letter in each instance was a post card addressed by rubber stamp to Steve Arnold Enterprises, and containing on the other side spaces which could be filled in by the player giving his name, the name of his team, his off-season address, the number of years his present contract has to run, not including the option year, and whether he would be interested in hearing an offer from the WFL. Some of the Club's players filled out and returned these cards and others did not.

WFL also published a brochure, apparently for public distribution giving certain information concerning the organization of WFL, its organizers and owners and pointing out, among other things, that players were available for the new league, including current professional players as well as graduating college seniors.

The Club argues that WFL is guilty of "pirating" its players and that unless enjoined it will continue to do so, but the only evidence of any contact whatever between WFL and the Club's players is the above quoted letter and the post card enclosed therewith. These writings do not suggest an unlawful "raiding scheme." The letter plainly states that the player should honor his existing contractual obligations and inquires only about the possibility of the player's interest in joining one of the WFL teams after the expiration of his present contract. There was no evidence of legal malice or deceitful means used by WFL or any motive or effort on its part to interfere with the contractual relations between the Club and its players.

The Club also contends that WFL arranged for, and induced three players to participate in, press conferences and various publicity activities surrounding the signing of contracts with WFL teams by Hill, Norton and Montgomery, thus causing a breach of the contracts between said players and the Club. In each of those contracts the player agrees "that during

the term of this contract he will play football and engage in activities related to football only for the Club . . . . "

The Club's principal contention is that the signing of the Cowboy players by WFL teams for services to be rendered after expiration of their present contracts is an unlawful interference with the Club's present contractual relations with its players, as defined by the above provision of its contracts, because the players so signing will not use their best efforts for the team under their current contracts, the morale of the entire team will suffer, the enthusiasm of the fans will wane, and the new employers will reap the benefits of any favorable publicity for outstanding performance of the players so signing. The Club argues further that publicity resulting from the signing of such contracts for future services is a breach of the present obligations which the players owe to the Club.

These facts, even if true, do not present grounds for equitable relief. We must consider the freedom of contract of the individual players as well as the rights of the Club under its present contracts. Bargaining for future services is a matter of economics. The Club can assure itself of the continued services and loyalty of its players by offering them long-term contracts and other financial inducements. If it chooses not to do so for economic reasons, it has no legal ground to complain if the players look elsewhere for their future careers and enter into contracts for services to be performed when their present contracts with the Club expire. Signing such contract is neither a breach of the contract by the players nor a tortious interference by the future employers, and the threat to enter into such contracts affords no ground for equitable relief. Neither does the publicity necessarily attendant upon the signing of contracts with well-known players constitute a tort. An injunction restraining the signing of such contracts because of the attendant publicity would be an unreasonable restraint on the freedom of contract of the players and their prospective employers.

We should not be understood, however, as holding that other promotional and publicity activities for the benefit of future employers would not be subject to restraint as "activities relating to football," which the players are bound by their present contracts to reserve for the Club. No such limited equitable relief was sought either in the trial court or in this court. The Club has cast its entire case for injunctive relief on its contention that the signing of contracts for future services would in itself be a tortious interference with the players' performance of their obligations under their present contracts with the Club. Since the injunction cannot be sustained on that ground, it must be dissolved.

We are familiar with the rule that the applicant need not "prove that he will prevail on final trial in order to invoke the trial court's discretion to grant a temporary injunction," Oil Field Haulers Ass'n v. Railroad Commission, 381 S.W.2d 183, 196 (Tex.1964); but he must introduce at least *some* admissible evidence tending to prove a cause of action, that is, "a probable right to a permanent injunction." *Id.* 381 S.W.2d at 192. *See also,* Garland v. Shepherd, 445 S.W.2d 602, 604–605 (Tex. Civ.App.—Dallas 1969, no writ). The Club does not deny that WFL, or any of its affiliated teams, has a legal right to contract with any players it may choose, but in effect claims for itself a "right" not to have any player presently under contract with it to enter into a contract with another team to be performed *in futuro.* That the Club has no such "right" is clearly enunciated in the cases of Washington Capitals Basketball Club, Inc. v. Barry, 419 F.2d 472 (9th Cir. 1969); and Munchak Corp. v. Cunningham, 457 F.2d 721 (4th Cir. 1972).

We therefore sustain WFL's fifth point of error and hold that since no tortious conduct on the part of WFL, or threat of

such conduct, has been shown, the trial court abused its discretion in granting the temporary injunction against it. This makes it unnecessary for us to pass on any of the other numerous points of error urged by WFL.

The temporary injunction is dissolved.