The CINCINNATI BENGALS,
INC., Plaintiff,

v.

William BERGEY et al., Defendants.

Civ. A. No. C–1–74–142.

United States District Court,
S. D. Ohio, W. D.

May 14, 1974.

John A. Lloyd, Jr., Cincinnati, Ohio, for plaintiff.

William L. Blum, Cincinnati, Ohio, for William Bergey.

George J. Moscarino, Cleveland, Ohio, for World Football League.

Stephen C. Drummy, Newport Beach, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

DAVID S. PORTER, District Judge:

This is an action for a preliminary and permanent injunction brought by The Cincinnati Bengals of the National Football League (NFL) against Bill Bergey, its premier linebacker, who has signed a contract for his future personal services with the Virginia Ambassadors of the new World Football League (WFL). It is also against the Ambassadors and the other eleven member teams of the WFL and the WFL itself. As to these defendants, the heart of the plaintiff's claim is that they are raiding the ranks of the Bengals unfairly by signing players under existing Bengal contracts to contracts for future services, *i. e.*, services to begin at the expiration of the player's present Bengal contract.

Plaintiff seeks to prevent the signing of any other Bengal players to future service contracts on the grounds that such signings will undermine the contractual rights of the Bengals to such player's full performance while still under contract to the Bengals.

Initially there was a claim that the WFL defendants were inducing breaches of the Bengals' contract with Bergey, and, unless enjoined, would do the same with other key players. Partly in reliance on such verified claims in the complaint, a temporary restraining order without notice was issued April 19, 1974. It expired on April 29, 1974. Plaintiff's motion to extend it for another ten days pursuant to Rule 65(b) was denied.

The motion for preliminary injunction was set for hearing, allowing time only for limited discovery. The issues presented by the evidence adduced at that hearing and the conflicting claims of the parties have been extensively briefed and argued orally. The evidence on the points in dispute was fairly well developed. As a result, though the precise question presented is a new one in the chapter on contracts in professional sports (and therefore one not ordinarily appropriate for resolution on a hurry-up basis), the Court is in a position to make a fairly complete analysis and report thereon to inform the parties of the basis of its decision and facilitate review thereof.

The Court's decision is that the motion is not well taken and it is, therefore, denied.

The following findings of facts and conclusions of law are made as required by Rule 52 Fed.R.Civ.P. In addition, we have supplemented such findings and conclusions with a discussion in detail of the applicable law, and other matters of special interest.

Though the plaintiff's claim that the defendants (other than Bergey) have induced breaches of its player contracts is not abandoned, it is not now seriously pressed. Hence, the focus of what follows is on the plaintiff's claim that its right to full performance under its player contracts has been and is being "undermined."

### FINDINGS OF FACT

General Findings as to Jurisdiction and Parties:

1. The Cincinnati Bengals, Inc., plaintiff herein, is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

2. William Bergey, one of the individual defendants herein, is a citizen of the Commonwealth of Kentucky. All of the other individual defendants are citizens of States other than Ohio.

3. The World Football League (WFL), defendant herein, is a nonprofit California corporation with its principal place of business in Newport Beach, California.

4. The corporate entities listed in the Appendix to this opinion own franchises to operate professional football teams in the WFL.

5. The matter in controversy in this case exceeds the sum or value of $10,000 exclusive of interest and costs.

### BACKGROUND

6. The Bengals are one of 26 teams in the National Football League (NFL). The Cincinnati Bengals, Inc., is the holder of a franchise to operate a professional football team as a member of NFL. The Bengals

were an expansion team, being granted a franchise in 1967 and began the exhibition of football games in competition with other NFL teams in 1968.

7.   During six seasons of competition in the NFL the Bengals have achieved greater success than is normally expected from an "expansion" team.   They have won their division title twice and are currently regarded as a serious contender for the World Championship.

8.   The success of the plaintiff's football team is due in large part to the careful selection of players and the grooming and training of these players by the Bengals' coaching staff after they join the team.   It is the coaching philosophy of Paul Brown, head coach of the Bengals, and his coaching staff to acquire young, quality players who can be moulded into highly trained units, i. e., the offensive line unit, the defensive unit, etc.   These quality players are plaintiff's most valuable assets (tr. 5/1/74, pp. 65–68).

9.   Professional football players possess unique talents and skills.   This is recognized in their contracts.   The pertinent provisions of the Standard Player Contract of the NFL are ¶¶ 6 and 8 which provide:

6.   The Player represents and warrants that he is and will continue to be sufficiently highly skilled in all types of football team play, to play professional football of the caliber required by the League and by the Club, and that he is and will continue to be in excellent physical condition, and agrees to perform his services hereunder to the complete satisfaction of the Club and its Head Coach.

\*     \*     \*     \*     \*     \*

8.   The Player hereby represents that he has special, exceptional and unique knowledge, skill and ability as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages and therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings against playing football or any other professional sport, without the consent of the Club, or engaging in activities related to football for any person, firm, corporation, institution, or on his own behalf, and against any other breach of this contract.   (Ex. attached to Amended Complaint)

10.   The WFL and its member teams, all defendants herein, seek to establish a new league of professional football teams. Each of the WFL member teams is currently engaged in the formation of a professional football team which will compete with the other WFL teams.   With one or two exceptions, all of such teams have stadiums in which to stage their football games and are currently engaged in selling tickets for the upcoming 1974 season.   For example, Mr. Putnam, one of the owners of the Birmingham Americans and a witness for the defendants, testified that to date 12,000 season tickets had been sold for the coming season.   The Americans will play in a stadium that seats 70,000 people (tr. 5/2/74, p. 84).

New leagues have emerged before on two occasions to compete with NFL, one being the All American Conference and the other American Football League.   In neither case did the members of the new league bid for the future services of players under contract with the NFL.

### EVENTS LEADING UP TO
### THIS LAWSUIT

11.   The WFL and NFL each held a college draft in 1974.   Of the college players drafted by the teams in both leagues, at least 50 signed with the newly organized WFL teams.   At least 83 former NFL players, i. e., players formerly under contract to NFL teams but free of any contract obligations to those teams, have signed contracts with WFL teams to play in the upcoming 1974 season.   WFL's own promotional brochure (px 6) represents that there is an ample presently available supply of football players to complete the 35-man roster (plus 6 on the taxi squad) of the WFL teams.   In this connection it is noteworthy that the

director of player personnel for the Chicago Fire, one of the WFL teams, testified that the Fire has currently 300 players under contract from which to select its squad (tr. 5/2/74, p. 19).

12. In order to further its own interests by giving the new league "credibility" in the eyes of prospective fans and players and to have established NFL stars on its rosters in future years, the WFL and its member teams have adopted a plan to sign such veteran NFL players to future service contracts. On at least one occasion (Csonka, Kiick, and Warfield) all the WFL member teams contributed to a fund to be used to induce such star NFL players to sign contracts with a WFL team for future services (tr. 5/1/74, pp. 140, 149; 52/74, pp. 14–16).

13. On April 9, 1974, Steve Chomyszak signed a contract to play professional football for the Philadelphia Bell, one of the newly organized WFL teams. The contract provides that Chomyszak shall begin playing football for the Bell at the conclusion of his contract with the Bengals unless he is sooner released by the Bengals in which event the contract "accelerates" and becomes effective for the 1974 season. Chomyszak is currently in his "option" year with the Bengals. His salary with the Philadelphia Bell will be greater than his salary with the Bengals. Chomyszak was asked to participate in a press conference to announce his signing with the Philadelphia Bell, but he was unable to do so because of illness (tr. 4/29/74, pp. 106–23).

14. Bill Bergey is currently under contract to play football for the Bengals through May, 1975. Under that contract the Bengals have the option to extend the term for an additional year. Bergey is the starting middle linebacker for the Bengals. He has been on the team for six years during which time his training and experience have made him one of the best linebackers in the NFL.

15. On April 17, 1974, Bergey signed a personal service contract with Washington Capitols, Inc., the owner of the WFL franchise for the Virginia Ambassadors. The contract provides that Bergey shall commence playing professional football for the Virginia Ambassadors in May, 1976. In consideration of signing the contract, Bergey received a bonus of $150,000, $40,000 of which was payable upon the signing of the contract. Bergey's compensation during the term of his contract with the Ambassadors is $125,000 per year. Bergey's compensation under his contract with the Bengals is $38,750. The Ambassadors' contract is what is known in professional football as a "no-cut" contract. In essence, that means that Bergey's compensation is payable regardless of his ability to play football at any time during the term of the contract. As with Chomyszak's contract, Bergey's contract with Washington Capitols, Inc., contains an acceleration clause which provides:

> However, should Bergey be released from his contract with The Cincinnati Bengals, Inc. so as to be available for the entire 1974 and 1975 football seasons or the entire 1975 football season, then, in such event, the term of this contract shall cover the 1974, 1975 and 1976 football seasons or the 1975, 1976 and 1977 football seasons, as the case may be, and the time periods referred to in paragraphs (3), (8), (10) and (11) hereof shall automatically be revised to reflect the revised term of this contract.

However, Bergey's contract also provides:

> From the date hereof through May 1, 1976, first party agrees that Bergey shall not play football or engage in any activities relative to football on behalf of either first party unless the term of this contract is accelerated pursuant to the provisions of paragraph (13) hereof.
> (px 3, cl. (2))

16. The Chomyszak and Bergey signings followed a professional football players' draft held by the WFL teams in New York. This draft consisted of 40 rounds in which each WFL team selected players currently under contract with NFL teams. Following that draft each WFL team had the exclusive right as against other WFL teams to sign the NFL players that it had drafted to future service contracts. At the conclu-

sion of the WFL draft, all the undrafted players on each NFL team were assigned to WFL teams. For example, the undrafted NFL players on the rosters of the Cleveland Browns and the Cincinnati Bengals were assigned to the Chicago Fire. That team then had the exclusive right to attempt to sign these players to future service contracts (tr. 5/2/74, pp. 12–14).

17. In addition to the Chomyszak and Bergey signings, several other Bengal players have received contract offers from WFL teams. Among these players are Rufus Mayes, starting offensive tackle; Bob Johnson, starting center; Bob Trumpy, starting tight end; and Dave Lewis, the Bengals' punter. Some of these offers were made directly by the WFL teams; most were made through independent agents. Of the offers made through independent agents, however, the Court finds that the agents approached the Bengals' players for the purpose of soliciting the agreement of these players to allow the agents to seek contract offers from WFL teams. The Court further finds that the recruiting activities of the WFL teams in attempting to sign certain players to future service contracts is done for the primary purpose of furthering its own interests, as indicated above, by giving the new league "credibility" in the eyes of its prospective fans and players. There is no proof that the motive for such policy is to undermine an NFL team of which the recruit is a member, though there is no concern on the part of the WFL team that the recruiting may have such an adverse effect.

At the time of signing the WFL contract, of course, Bergey was aware he still had two years to play under the Bengals' contract. The officials of Washington Capitols, Inc., were also aware of this.

18. The emergence of the new league has made for competition for the services of the players in question and prompted their inquiries to determine their "marketability." Such emergence has also increased "player mobility." In that connection all NFL player contracts—standard player contracts—contain a provision granting the football club an option to extend the player's contract for a year, if, at the end of such contract, the parties have not agreed on a new one. Also, the contract incorporates the by-laws and constitution of the NFL and in one of these documents there is what is known as the player compensation rule. It is also known as the Rozelle rule. Under the provisions of such rule, when a player plays out his option, if he goes to another NFL team, that team has to compensate the one from which he came. If the clubs cannot agree on the amount of compensation, it is fixed by the Commissioner and it may be as high as a first-round draft choice, which is extremely valuable. The evidence showed that there is some dissatisfaction among the NFL players with this rule because of their belief that it limits player mobility. The rule is the subject of negotiation between the players' association and the NFL member clubs. It is also in litigation. But in any event some players think the rule limits their mobility somewhat, and many players apparently desire such mobility. The plaintiff says the purpose of the player compensation rule is to prevent personnel imbalance, i. e., to promote parity between the NFL clubs.

19. On learning of Bergey's offer from the WFL, the Bengals offered to tear up his contract, replace it with one for a period of five years (not a "no-cut") with a dramatic increase in pay. Altogether it amounted to about a $400,000 package plus fringe benefits. This was refused. The Bengals considered attempting to trade Bergey to an NFL team which could match the WFL offer, but dropped the idea when it could not locate Bergey.

## PLAINTIFF'S CLAIM OF HARM

### 20.—NATURE OF FOOTBALL

A consideration of the plaintiff's claims that it is being irreparably harmed by the alleged interference with its contractual relations requires findings as to the nature of football. Professional football, of course, is a business, but the findings relate to the nature of the sport, and much of the testimony was about the nature of the sport in

order to show the effect of the signing to future contracts by Bergey and Chomyszak and the probable effect it will have if WFL member teams sign other key players of the Bengals.

First, it is in order to note the following testimony of Coach Paul Brown (Paul Brown, tr. 64–66):

Q. Can you tell the Court in a general way the system that you followed in organizing and building the Cincinnati Bengals football team?

A. Well, the first people that we got in terms of being players was the allocation from the American League, which were in the process of merger with the National League. Primarily, though, we built it by way of the drafting of college players, which I consider the life's blood of our business. We also picked up innumerable free agents, and some of them did very well for us, people like Chomyszak, Avery, and really quite a few—Dave Lewis—a lot of them.

Q. In the course of your experience as a football coach, have you reached any general conclusions concerning the major factors which influence the success and performance of football teams?

A. Well, I've got a pretty good firm opinion of what I think makes it go. To begin with a football team, when you get a franchise, you get a certificate that you hang on the wall, and really it's a lot more than that, and a heap of jerseys and pants and shoes and athletic supporters in the corner of a locker room. It comes down to nothing, really, but people. It's the getting of people, putting them together and getting them into the spirit and paying the price towards a common objective of trying to win a football game, is the name of the game, really.

When I first go to camp with the football players, I year after year—some of these fellows out here have listened to this for six years. Groza, I think, listened to it for about 20. I give them a talk, a morning talk. Takes quite a bit of time, about how we operate, the things that I think are important, just all aspects of what I think make for a successful operation.

Try to point out to them that if they're ever a bad character or boozer or chaser or what not, we're that much farther away from winning what we're trying to win.

I explained to them that they are free to come in and talk with me at any time they want to about anything that might be on their mind. We go into the details of why we are going through the disciplines that we are going through there. I'm not interested in trying to moralize. I'm really interested in getting their best effort.

And I tell them that this isn't for moral reasons. It's because we think we have the right in our agreements with them to receive their best. And I'm in the process of trying to prepare them physically and mentally to arrive at that point. More football players fail mentally and quicker from that standpoint than they do from the physical.

\* \* \* \* \* \*

To sum it up in an academic sort of a way we have our eternal verities, too. It comes into play with us just like it does in all other phases of living.

Typical of the description of other witnesses, all coaches, is that of Mike McCormick, coach of the Philadelphia Eagles, given in response to a question as to why he turned down an offer to trade Bill Bergey for the remaining two years of his contract. (McCormick, p. 47):

A. Really for two reasons. I think that professional football is a sport that is unique. It is unlike any other sport in that it takes total concentration, total effort on a group of 47 people. I believe that the individual sometimes has to suppress himself for the good of the football team. And I believe it's a game where, as the immediate supervisor, the head coach has to have control. I believe if a man is under contract to someone else, then that leverage and control has been taken away from the head coach. The second reason is we have tried to build a

team spirit in Philadelphia that I think is starting. We have had several players approached by the World Football League.

Others, assistant coaches for the Bengals—Bill Walsh and Jack Donaldson, Bill Johnson and Chuck Studley, as well as one player, Mike Reed—embellished the description, noting that football was different from other professional sports such as hockey and basketball; the game needs inspirational performances and the players "investment" must be with the team on which he is playing. It takes time and money to find and develop a unit and it was emphasized that players work as a unit. Also it takes five or six years to develop a player of the caliber of those on the Bengals who have already signed or who are considering signing with WFL teams.

It was pointed out that football has an emotional aspect and preparation during the week is important to a player's ability to give total concentration on game day. The word "cohesive" kept surfacing in the description of the units, such as the defensive unit and the offensive line. Lastly, one coach noted that a football team is a "delicate group of people," meaning there is a delicate balance—a fine honing—necessary to success.

From all this the Court can and does find that football is probably unique in that, to a greater degree than other professional sports, it is a team sport. Also it takes time and money to develop the players and "units" so that they will be cohesive. In short, football is a scientific, sophisticated sport, and a delicate sort of mechanism.

## 21.—EFFECT ON BERGEY'S PERFORMANCE

Plaintiff claims that signing with a WFL team for future services will have an effect on Bill Bergey's ability to perform as required for the Bengals. In considering that claim one must not only take into account the nature of football but the fact that Bergey is a fine young man, an emotional person, with a great competitive spirit. Bergey has no intention of breaching his contract by letting down in the slightest. Besides pride and the desire to live up to his reputation as an outstanding football player, it is in Bergey's best interest to play as aggressively and capably for the Bengals as he has in the past to avoid physical injury (to the extent that is possible in professional football). One must consider, also, that Bergey has been advised by the coach of the WFL team to which he is under contract for 1976, *et seq.*, that Bergey should attempt to make his next two playing years with the Bengals the best of his life in order to "live with himself" now.

All things considered, the Court finds that it is unlikely that Bergey's performance with the Bengals in the upcoming two seasons will be impaired to any significant extent. The Court cannot find that Bergey's performance definitely will not suffer from the fact that he has signed with the WFL but only that such impairment probably will not occur. We are not overlooking testimony from at least two coaches and one player to the effect that Bergey plays a highly emotional game and that his ability to reach the necessary emotional peak for a Sunday game may be lessened by certain hard-to-describe "distractions" and "forces" working on him during the week. But for the Court to conclude that testimony of this sort is sufficient to establish that it is more likely than not that Bergey cannot or will not give his best efforts to the Bengals for two more years would be to treat as substantial what is essentially speculative.

## 22.—EFFECT ON OTHER BENGALS' PLAYERS FROM BERGEY' SIGNING WITH WFL

The Court finds it unlikely that Bergey's actions in signing with the WFL will have a detrimental effect on the performance or player morale of the Bengals team as a whole. This finding is based on the testimony of several players who stated that their relationship with Bergey had not been in any way damaged, and the statement by Coach Studley that no animosity was apparent among the Bengals players as a result of this lawsuit. The Court cannot find that

Bergey's signing definitely will not adversely affect the team, however, but only that such effect is unlikely, because even the players who testified that Bergey's relationship with them is still the same were unable to state whether the other members of the team would feel the same way. The fact is, if it is assumed that prior to signing with the WFL Bergey's interests with the Cincinnati Bengals were coextensive with the interests of all the other Bengals players, Bergey, in a sense which defies precise definition, is now a man apart from the other players. But the testimony of Coach McCormick of the Philadelphia Eagles, to the effect that Bergey will be "a division" whether he wants to be or not, only restates the question and does not provide the answer as to the degree to which Bergey will affect the team in an adverse manner, or if, in fact, there will be any such effect at all. We cannot say that such testimony establishes the likelihood that Bergey will have a divisive influence on his teammates.

### 23.—EFFECT ON BENGALS IF SEVERAL PLAYERS SIGN WITH WFL

The Court finds that it is likely that there would be an adverse effect on the Bengals as a team if "several" members of the team were to sign contracts with the WFL even though performance under those agreements was not to commence until after the expiration of the players' current contracts with the Bengals. This finding has an element of conjecture because Bergey is the only Bengal player in the starting lineup who has actually signed a WFL contract. Nevertheless, the testimony was sufficient to establish a likelihood that the Bengals' performance as a team would suffer if a group consisting, say, of Bob Trumpy, Bob Johnson, Rufus Mayes and Pat Matson, in addition to Bergey, were to sign contracts with the WFL. Precisely why this is so, and the number of signings that would have to occur in order to put the Bengals in real jeopardy as a National Football League competitor, are things which are difficult to articulate. However, in view of our finding that a football team is a sort of delicate mechanism, the success of whose operation is dependent upon the coordination of various cohesive units, the Court finds that the testimony, primarily of the Bengals' coaches, established that a significant element of the team's competitive success probably would be affected if a sizeable group of starting players were under contract to another team.

Lest there be any misinterpretation, the Court feels it necessary to emphasize that this finding is not tantamount to a conclusion that the Bengals will be "irreparably harmed" in the legal sense by a denial of injunctive relief. The Court's finding here is only a recognition that whatever problem the Bengals might encounter in dealing with defendant Bergey until his contract expires would be compounded if a faction of starting players who had signed with the WFL coexisted with nonsigners on the Bengals' team.

### 24.—HARM TO WFL:

The Court finds that the WFL will be greatly harmed if enjoined in its promotional efforts. A great many people have vast sums of money invested in the WFL. For instance, Mr. Putnam of the Birmingham Americans testified that he has over $1 million invested. The WFL is about to begin its first season. There are to be no exhibition games. Training camp starts in June and the first games are scheduled for the first of July.

The Court finds that starting a new franchise and a new league is a risky business. In 1960 there were twelve teams in the NFL and eight in the AFL (American Football League). Now there are twenty-six NFL teams in twenty-five cities. This limits the availability of stadiums to a new league. For example, the Virginia Ambassadors were originally known as the Washington Ambassadors and were based in the District of Columbia. The Ambassadors left Washington upon learning that they would have to pay an amount well in excess of $1½ million to the Washington Redskins of the NFL in order for that team to agree to waive its exclusive rights to play in

R.F.K. Stadium. That price was more than the Ambassadors wanted to pay, and there being no other suitable facility in Washington, D.C., the team moved to Virginia.

Increased television coverage of professional football games has produced a sophisticated audience. The costs of fielding a competitive team are much higher today than in 1960. The cost of acquiring players of exceptional ability has contributed significantly to the substantial increase in ticket prices (though these price increases have not been proportionately as great as the increase in costs). The higher ticket prices mean that sports fans expect major league entertainment for their sports dollar. Faced with the stiff competition for the sports dollar by the NFL, as well as other professional sports organizations, the WFL seeks to ensure its future by signing established NFL players to give the new league "credibility" in the eyes of the public. The signing of professional players is also necessary to overcome the doubts of college players as to the future of the league. There was testimony that these doubts are very real, since players recognize that if they sign with the WFL and that league folds, they may face difficulty in attempting to sign with the NFL. Thus, Mr. Putnam stated that Birmingham's signing of Ken Stabler, whose contract with the Oakland NFL team has another year to run, had a "tremendous" effect on the status of his teams in the eyes of the public. The Birmingham team will play in a stadium which seats 70,000. To date, 12,000 season tickets have been sold. Mr. Putnam stated that the signing of name players to future contracts is "essential" to the WFL's success, since the league's financial future is dependent in great part on the earliest possible public acceptance of the WFL as a marketer of "major league" professional football.

The Court finds that the WFL's motive for signing established NFL players is not to cause any harm to the NFL teams in general or the Cincinnati Bengals in particular, but to further the competitive interests of the WFL.

## CONCLUSIONS OF LAW

1. The Court has personal jurisdiction over the parties. The Court also has jurisdiction over the subject matter of this action on grounds of diversity of citizenship between the plaintiff and the defendants.

2. Defendant Bergey did not breach his contract with the Bengals by signing with the Virginia Ambassadors of the World Football League.

3. It was not unlawful for the defendant, Washington Capitols, Inc., during the time when Bergey was under a valid contract with the Bengals, to negotiate and enter into a contract for Bergey's personal services, the performance of which was not to commence until after the expiration of Bergey's contract with the Bengals.

4. Plaintiff has not established a likelihood of success in its claim that it suffered a tortious interference with its right to full performance under Bergey's contract.

5. As to plaintiff's entitlement to injunctive relief, the Court concludes that plaintiff has failed to show an absence of harm to the public interest if an injunction is granted. On the contrary, the Court must conclude that if the injunction is granted there will be harm to the public interest in fostering free competition in the marketplace for the sports dollar. The Court concludes that plaintiff has failed to establish an absence of substantial harm to the defendants and other interested parties, namely, the players under existing contracts—if an injunction is granted. On the contrary, the Court concludes that the granting of injunctive relief would cause substantial harm to the WFL defendants.

6. Finally, the Court concludes that the plaintiff has not established probability of success in its action for injunctive relief because the facts do not present a clear case of irreparable harm to the plaintiff for which there is no adequate remedy at law and which can only be prevented by the granting of injunctive relief. On the contrary, the Court finds that the threatened harm is at least in part preventable and it is

not clear that plaintiff has no adequate remedy at law if it ultimately prevails in its substantive claim.

## DISCUSSION

We next discuss the law which compels the foregoing conclusions. As good a place as any to begin is by noting that plaintiff's counsel have been frank to state that none of their reported cases are directly in point and this case is somewhat apart from any which has gone before it (Supplemental Memorandum in Support of Motion for Preliminary Injunction, p. 26).

That may be, but, in *Triangle Film Corp. v. Artcraft Pictures Corp.*, 250 F. 981, 982 (2 Cir., 1918), Judge Learned Hand stated:

"Nobody has ever thought, so far as we can find, that in the absence of some monopolistic purpose every one has not the right to offer better terms to another's employé, so long as the latter is free to leave."

Judge Hand's statement is quoted in *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9 Cir., 1969), one of two cases which we deem highly pertinent to the instant matter. Of all the "sports" cases (see, *e. g.*, cases cited in *Nassau Sports v. Peters*, 352 F.Supp. 870, 872 (E.D.N.Y., 1972), at Note 2)[1] to which the Court has directed its attention, the *Barry* case and

*Munchak Corporation v. Cunningham*, 457 F.2d 721 (4 Cir., 1972) are the closest to the case before us on their facts.

Plaintiff characterizes the *Barry* holding of the Ninth Circuit Court of Appeals as "some poorly considered and unfortunate *dictum*." We disagree. It is our view that the holding in regard to a contract for future services while one is still under contract with a competitor was indeed central to the rejection of the Warriors' unclean hands defense and, therefore, not *dictum* in any sense. We agree with the WFL defendants that the same thing is true with respect to the Fourth Circuit's holding in *Cunningham* where the reasoning of the *Barry* case was adopted in the reversal of the holding below denying injunctive relief for unclean hands.

We consider significant the fact that nowhere in the plaintiff's attempt to overcome the obstacle of *Barry* and *Cunningham* is there any reference to the statement of Judge Learned Hand quoted at the outset of this discussion.

It must be kept in mind that the instant case does not present the issue of whether a player's attempt to breach his contract with an established athletic league and jump to a rival league should be thwarted by injunctive relief. See, *e. g.*, *Central New York Basketball, Inc. v. Barnett*, 19 Ohio Ops. 2d

---

1. [2] Baseball: *Cincinnati Exhibition Co. v. Marsans*, 216 F. 269 (E.D.Mo.1914); *Brooklyn Baseball Club v. McGuire*, 116 F. 782 (E.D.Pa. 1902); *Metropolitan Exhibition Co. v. Ewing*, 42 F. 198 (S.D.N.Y.1890); *Augusta Baseball Ass'n v. Thomasville Baseball Club*, 147 Ga. 201, 93 S.E. 208 (1917); *Cincinnati Exhibition Co. v. Johnson*, 190 Ill.App. 630 (1914); *American Base Ball and Athletic Exhibition Co. v. Harper*, 54 Cent.L.J. 449 (Cir.Ct. of St. Louis, May 1902); *America League Baseball Club of Chicago v. Chase*, 86 Misc. 441, 149 N.Y.S. 6 (Sup.Ct.1914); *Metropolitan Exhibition Co. v. Ward*, 24 Abb.N.Cas. 393, 9 N.Y.S. 779 (Sup.Ct. 1890); *Philadelphia Ball Club, Ltd. v. Lajoie*, 202 Pa. 210, 51 A. 973 (1902).

Football: *Houston Oilers, Inc. v. Neely*, 361 F.2d 36 (10 Cir.), cert. denied 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); *New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc.*, 291 F.2d 471 (5 Cir. 1961); *Detroit Football Co. v. Robinson*, 186 F.Supp. 933 (E.D.La.), affd. 283 F.2d 657 (5 Cir. 1960);

*Los Angeles Rams Football Club v. Cannon*, 185 F.Supp. 717 (S.D.Cal.1960); *Winnipeg Rugby Football Club, Ltd. v. Freeman*, 140 F.Supp. 365 (N.D. Ohio 1955); *Long Island American Ass'n Football Club, Inc. v. Manrodt*, 23 N.Y.S.2d 858 (Sup.Ct.1940); *Dallas Cowboys Football Club, Inc. v. Harris*, 348 S.W.2d 37 (Tex.Civ.App.1961).

Basketball: *Haywood v. National Basketball Association*, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971); *Munchak Corp. v. Cunningham*, 457 F.2d 721 (4 Cir. 1972); *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472 (9 Cir. 1969); *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971); *Minnesota Muskies, Inc. v. Hudson*, 294 F.Supp. 979 (M.D.N.C.1969); *Connecticut Professional Sports Corp. v. Heyman*, 276 F.Supp. 618 (S.D.N.Y.1967); *Lemat Corp. v. Barry*, 275 Cal.App.2d 671, 80 Cal.Rptr. 240 (Ct.App.1969); *Central New York Basketball, Inc. v. Barnett*, 190 Ohio Op.2d 130, 181 N.E.2d 506 (Ohio Com.Pl.1961).

130, 181 N.E.2d 506 (C.C.P., 1961); *Winnepeg Rugby Football Club v. Freeman,* 140 F.Supp. 365 (N.D.Ohio, 1955). The resolution of those cases usually turns on whether the player is possessed of certain unique knowledge, ability and skill, the absence of which cannot be compensated for in dollars alone. The underlying principle in these decisions is that courts will grant injunctive relief to restrain violation of the employee of negative covenants where the employee in a personal service contract has the above-mentioned "irreplaceable" attributes. See also, *Dallas Cowboys' Football Club v. Harris,* 348 S.W.2d 37 (Tex.Civ.App., 1961). We need not decide whether Bergey's skills are of the quality comprehended by the decisions in this line of cases, but only whether it is likely that plaintiff will prevail on the merits of the claim which is the heart of its case, namely, that Bergey's signing with the WFL and the threatened signing by others, has and will undermine the ability of the players in question to deliver the services for which the Bengals bargained. Plaintiff views its case as essentially one for interference with its player contracts.

We digress to say we are mindful that plaintiff views this case as one involving large and far-reaching issues which should not be decided on the basis of anything "small or superficial." In this connection we give full weight to the statement on behalf of all parties that the case is of extreme importance to them. A careful and thorough study of the questions presented is not only dictated by the importance of the case to the parties but by the nature of the case.

In the chapter on interference with contractual relations in a leading text, Prosser, Torts, 4th Ed., pp. 927, *et seq.,* there are certain observations which are well to keep in mind, and which we have kept in mind. One is, of course:

> " . . . the recognition that economic relations are entitled to protection against unreasonable interference is on the whole a comparatively recent development. Most of the law has arisen since the beginning of the twentieth century,

and it is necessarily a product of the methods and conditions of modern industry and trade. As these have altered more or less rapidly, and our social ideas have changed with them, the law inevitably has passed through a number of successive changes, attended with some confusion, uncertainty and disagreement. In this field, perhaps more obviously than any other, the problem has continuously been one of adjustment of the conflicting claims of different enterprises, industries, classes and groups, where interests are nicely balanced, and decision on the basis of social policy is not an easy matter."

The author goes on to note that the personal prejudices and predelictions of the judges have been at work. Also, one should guard against taking refuge in a formula and a "compete analysis of the problems" should not be avoided. *Id.,* p. 927.

It will be seen from the description, *infra,* p. 145 of the guidelines to be followed in deciding whether a preliminary injunction should be granted, that it will not be awarded in "doubtful cases, or new ones, not coming within well-established principles. . . ." Also, the right asserted must be clear. The right asserted by the plaintiff is not clear unless it overcomes the obstacle posed by the decisions in *Barry, supra,* and *Cunningham, supra.* Plaintiff recognizes this, and much of its effort has been to persuade the Court that these cases are distinguishable on their facts and for that and other reasons should not be followed (plaintiff's Supplemental Memorandum in Support of Motion for Preliminary Injunction, pp. 6–15). We proceed to a discussion of those cases.

## —BARRY AND CUNNINGHAM

*Washington Capitols Basketball Club, Inc. v. Barry, supra,* was an appeal from the granting of a preliminary injunction to the Capitols (of the American Basketball Association (ABAM)) and enjoining the San Francisco Warriors (of the National Basketball Association (NBA)) from attempting to enforce a five-year playing contract signed on August 26, 1969, between Barry and the Warriors.

All parties agreed that Barry was a legally "unique" party to the contract.

In August of 1966 Barry had signed a contract with the Warriors which contained an option clause. The option had been exercised and Barry was to play for the Warriors for the 1967–68 season. In the meantime, on June 19, 1967, Barry had signed with the Oakland Oaks (an ABA team which was a predecessor of the Capitols) for three years, beginning with the 1967–68 season or later if he were enjoined from playing that season. The contract which Barry signed with the Oaks was to commence October 2, 1968. The contract had a reserve clause and gave Barry an annual bonus plus a 15% stock interest in the Oaks.

The Warriors brought suit in California state court, and that court held that the Warriors were entitled to injunctive relief through September 30, 1968, but not beyond that time. *Lemat Corp. v. Barry,* 80 Cal. Rep. 240 (Ct.App.1969). Barry did not play during the 1967–68 season but did play for Oakland during the 1968–69 season. In August, 1969 the Oaks were sold to the Capitols and Barry's contract was assigned to the Washington team. The day following the purchase agreement Barry entered into a five-year contract with the Warriors to begin October, 1969 (his Oaks' contract was to have run to October, 1971). When the Capitols found out about this contract they brought suit.

The Court agreed with the District Court's opinion that the contract between the Oaks and Barry was not "unconscionable, unenforceable, or otherwise void." The Court also stated that it did not think the contract was against public policy, rejecting the argument that the contract required for its performance breach of a contract with another—thus agreeing with the interpretation placed on the contract by the state court in *Lemat, supra.* The Court said that Barry's performance under the Oaks contract, which was to commence October 2, 1968, did not require breach of his Warrior contract, which expired September 30, 1968. Under Barry's Warrior contract, he was not obligated to play for them during the op-

tion year (1967–68) but was obligated to refrain from playing during that year for any other team. The following language is pertinent to our case:

Barry signed his contract with Oakland while still under contract to the Warriors, who claim that this act was a breach of Barry's contract to them. The Oakland contract, however, was a contract for future services "for a term of three (3) years commencing on October 2, 1968, or such earlier date as [Barry's] services as a basketball player are not enjoined." Performance and consideration therefor were to begin only upon the termination of the Warrior contract.

Neither Barry's signing nor Oakland's inducement of him to sign was an illegal act rendering the Oakland contract illegal. Associate Justice Hufstedler of the California Court of Appeal, now Judge Hufstedler of this Court, stated in *Diodes, Inc. v. Franzen,* 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 25–26 (1968):

> "Even though the relationship between an employer and his employee is an advantageous one, no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action."

*See also, Sarkes Tarzian, Inc. v. Audio Devices, Inc.,* 166 F.Supp. 250, 264 (S.D. Cal.1958), aff'd, 283 F.2d 695 (2 Cir. 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). In each of these cases, the hired-away employee was not under contract to his employer. Barry was under contract to the Warriors at the time he signed with Oakland but his performance under the Oakland contract was not to begin until after his obligations to the Warriors ceased on October 1, 1968. This fact distinguishes cases in which courts have found an actionable wrong where an employee was encouraged to terminate his contract prior to its termination date. *See, e. g., Buxbom v. Smith,* 23 Cal.2d 535, 145 P.2d 305 (1944).

419 F.2d 477–78.

The *Barry* case is cited with approval by the Court in *Munchak Corporation v. Cunningham*, 457 F.2d 721 (4 Cir., 1972), although the case is treated in the section of the opinion dealing with the clean hands doctrine. Nevertheless, *Cunningham* is of at least some help since it involves contract negotiations being carried on with a competitor league at a time when the original contract is still in effect. Also *Cunningham* talks about a player's "incentive" to play.

Cunningham had a contract with the Philadelphia 76ers to play for them during the period October 1, 1969 to October 1, 1970. The contract contained a reserve clause which gave the 76ers the right to tender another contract before September 1, 1970, to play for the next season. If Cunningham failed, neglected or omitted to sign the tendered contract, the existing contract would be continued for another year, but at the rate of compensation fixed in the tendered contract (provided it was not less than 75% of the amount in the existing contract).

During May or June of 1969, the Cougars, an ABA team, entered into negotiations with Cunningham, which, in August, 1969, ripened into a contract for three years, commencing October 2, 1971. There was also a parol agreement concerning compensation by the Cougars under which the Cougars would pay on an $80,000 promissory note if Cunningham elected to play for the 76ers during his option year for an amount in excess of a certain sum (either $80,000 or $100,000). If he agreed to play for less than $80,000, the note was payable to the extent necessary to make up the difference between the salary with the 76ers and $100,000. If he decided not to play with the 76ers during his option year, then the note was to be paid in full.

". . . Thus, if we accept the testimony that the note was cancellable if the 76ers paid Cunningham at least $80,-000.00, the note provided an *incentive* for Cunningham—to the maximum extent of $20,000.00—to play for the 76ers if they paid him less than $80,000.00; and if we accept the testimony that the note was cancellable if the 76ers paid him at least $100,000.00, then the note provided an ever greater incentive . . . to play." (Emphasis added.)
457 F.2d, at 723.

The Court addressed itself to the contention that the note constituted tortious interference with the business conduct of the 76ers:

In agreement with *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472 (9 Cir. 1969), we think that there was neither illegality nor unclean hands in the Cougars' contracting for Cunningham's services to be rendered *after* the term of his contract with the 76ers had expired, notwithstanding that the negotiations, whether directly or through intermediaries, took place while Cunningham's contract with the 76ers was still in full force and effect. As the *Washington Capitols* case stated, quoting from *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 26 (1968), " 'no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action.' " Cunningham was under no obligation, option or restraint with respect to the 76ers after October 1, 1971, and the Cougars had a lawful right to bid and contract for his services to be rendered after that date.

Nor do we think that there was illegal inducement or unclean hands in the agreement to pay $80,000.00. As we have stated, the note was to be cancelled only if the 76ers agreed to pay Cunningham more than a certain sum—$80,000.00, testified to by Cunningham's representative and $100,000.00, according to a Cougar representative. But unless the 76ers agreed to pay at least that sum the note was payable in whole or in part to the extent necessary to enlarge Cunningham's total compensation to $100,000.00. Thus, the giving of the note was an in-

centive to Cunningham to perform his contract with the 76ers, not a tortious interference with the performance of his contract. Of course, the note was payable in full if Cunningham "sat out" his option year with the 76ers, but Cunningham already had this right since he could not be required to render personal services against his will. The incentive the note provided—to a maximum of $20,-000.00 over the amount payable if he did not play—substantially diminished the likelihood that he would exercise this right.

457 F.2d, at 724.

A threshold question is whether the precedential value of the above two cases should be limited to questions involving professional basketball players and should not influence a decision in the context of professional football. In that connection several witnesses were questioned at the hearing on the preliminary injunction as to whether football was more of a team sport than basketball. The responses to these inquiries were not particularly persuasive on the issue beyond the conclusion that certain differences between the two sports do exist in the degree to which success depends upon the abilities of individual players as opposed to the coordinated efforts of the team as a whole. Perhaps the most enlightening comment in this regard was Coach Paul Brown's reference to the fact that there are no batting or fielding averages in football, and that it can never be known how many blocks and tackles are missed that should have been made. While recognizing that the nature of football is such that certain differences between it and other professional sports exist, we are not convinced that the distinctions are so great as to render the *Barry* and *Cunningham* decisions worthless as precedents for this case. On the contrary, we think they are foremost among the few authorities which are available to the Court for assistance in this action which is so unlike most of the "sports cases" to which our attention has been directed.

Our interpretation of *Barry* and *Cunningham*, both *supra*, requires that we reject the principal argument of the Bengals here, namely, that the Courts' statements as to the validity of the pertinent contracts are only *dicta* not binding on this Court. In both cases, the Courts expressly stated that no illegality attended the negotiation and signing of contracts for the players' future services, even though negotiation and agreement were accomplished while the players were under contract to other, competing teams. 472 F.2d, at 477, 478; 457 F.2d, at 724. As the defendant WFL correctly points out, the language in *Barry* concerning the legality of the Oakland contract was central to the Court's rejection of the unclean hands defense urged by San Francisco. The same is true in the *Cunningham* case. The plaintiff's argument that the issue before the Ninth Circuit was whether the successor team to Oakland could enjoin Barry from playing once again for San Francisco in direct violation of his Oakland contract states too little. Had the Court concluded that Barry's signing or Oakland's inducement of him to sign prior to the expiration of his contract with San Francisco rendered the new contract illegal, it could not have permitted injunctive relief from interference with the player's performance under the contract. Similarly, the Fourth Circuit based its decision on the conclusion that there were no more obligations to be protected under Cunningham's contract with the 76ers after it expired, and that other professional basketball teams, including a team from a rival league, were free during the contract term to bid for the player's services to be rendered after the expiration date.

The plaintiff makes much of the statement of the Court in *Barry* that "performance *and consideration*" for the Oakland contract were not to take place until the San Francisco contract had terminated. 419 F.2d, at 477 (emphasis supplied). Plaintiff seeks to mitigate the persuasiveness of *Barry* by emphasizing the fact that defendant Bergey has already received compensation for signing with the WFL. The plaintiff's interpretation of the Court's language is in doubt in view of the statement in *Lemat Corp. v. Barry, supra*, that Barry

was paid $75,000 by the Oaks for the 1967–68 season (his last with the Warriors under the 1966 contract). We feel no need to resolve this conflict, however, because it is clear from the opinion in *Cunningham* that the Court was aware that the player had received a substantial bonus at the time he signed the contract for his future services. That knowledge, however, did not prompt the Court to condemn the practice in any way. Plaintiff's assertion that Barry was "induced" to "sit out" his option year with the Warriors is not supported by the record of the case. Moreover, the Fourth Circuit squarely addressed the issue of whether the $80,000 note constituted an inducement for Cunningham to "sit out" and concluded that the incentive the note provided substantially diminished the likelihood that Cunningham would exercise his lawful right to refuse to render his personal services against his will.

Finally, the plaintiff's argument that the *Barry* and *Cunningham* courts were not confronted with a "raiding" situation, as exists in the instant case, is not germane to the issue of whether the two cases have precedential value here. The term "raid" is in itself a sort of legal conclusion, and the word has been used consistently by the plaintiff as shorthand for defendant WFL's asserted malicious interference with plaintiff's business conduct. In the absence of facts supporting this argument, we decline to speculate as to whether the Warriors and the 76ers felt they were being "raided" of their respective superstars. We think discussion of the "raid" aspect of this case is more appropriate in the specific context of whether plaintiff will suffer irreparable harm if denied injunctive relief, and we have dealt with the subject in that portion of this opinion.

■ When *Barry* and *Cunningham* are applied to the case at bar, the Court can only conclude that neither the WFL nor Bergey committed a tortious or otherwise unlawful act in entering into negotiations for and reaching agreement upon a contract for Bergey's personal services to commence after the expiration of his contract with the Bengals. In the language of *Cunningham*, there are no more obligations to be protected by either party to the Bengals contract after May 1, 1976.

Plaintiff argues that the acceleration clause of Bergey's WFL contract induces Bergey to seek his release prior to his NFL contract's expiration. We reject this argument, however, because we accept as true Bergey's testimony that he has no intention of seeking an early release. And, notwithstanding plaintiff's interpretation of *Barry*, we do not read the Ninth Circuit's opinion in that case as granting to Barry the right to breach his contract. Bergey will be liable should he breach his contract while its terms are still in effect.

We think plaintiff's emphasis on the statement by Steve Chomyszak that he was desirous of becoming free from his Bengals contract is unwarranted. Chomyszak also stated in response to a question on direct examination that he did not intend to seek an early release from the Bengals, but would honor the option clause. In addition, Chomyszak testified that he was on the bench for part of last season and did not expect to start next season, so he had decided to play out his option. This decision was made prior to any contact with the WFL. Moreover, we accept as true Bergey's statement that the acceleration clause was included in the contract at his insistence solely to avoid the possibility of his having to sit idle for one or two years during the prime of his career should the Bengals decide to release him from his contract prior to its expiration. The Court concludes that there is no incentive to Bergey to compromise with his pride in his playing ability which impels him to be the aggressive player that he is.

■ In short, we conclude that *Barry* and *Cunningham* support the proposition that it is not illegal for either the player or the sports organization, at the time when the player is under a valid contract to one team, to negotiate and enter into a contract with a different, competing, team and league, under the terms of which the player agrees to render his services at the expiration of his current contract.

## —RULES GOVERNING PRELIMINARY INJUNCTIONS

■ It is next in order to note a preliminary injunction or any injunction is a drastic remedy and the decision about an injunction is one addressed to the discretion of the Court. However, there are guidelines and these must be followed. In *Detroit News. Pub. Ass'n v. Detroit Typo. Un. No. 18, etc.*, 471 F.2d 872 (1972), the Court quoted from Professor Wright, as follows:

"'The classic principles governing availability of injunctions were summarized by Justice Baldwin, sitting at circuit, in 1830: "There is no power the exercise of which is more delicate, which requires greater caution; deliberation, and sound discretion or more dangerous in a doubtful case, than the issuing an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction: but that will not be awarded in doubtful cases, or new ones, not coming within well established principles; . . It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act; . . ."'
3 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 1431." 471 F.2d, at 876.

■ Next, where there are novel or complex issues of law or fact that have not been resolved a preliminary injunction should be denied, *N.W. Controls, Inc. v. Outboard Marine Corp.*, 317 F.Supp. 698, 702 (D.Del., 1970); *Surber v. United States*, 285 F.Supp. 775, 777 (S.D.Ohio, 1968).

We conclude that the law of Ohio governing the general approach in an injunction case is substantially the same as that stated above. See, generally, 29 Ohio Jur.2d Injunctions §§ 12–16.

■ The plaintiff has the burden to satisfy the four essential criteria set forth in *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462 (E.D.Pa., 1972), as follows:

1. Irreparable harm to plaintiff absent the injunction;
2. Absence of substantial harm to defendant or other interested parties;
3. Absence of harm to the public interest;
4. A likelihood that plaintiff will prevail on the merits.

■ A preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant by a clear showing demonstrates his right to such relief. In *Garlock, Inc. v. United Seal Incorporated*, 404 F.2d 256 (6 Cir., 1968), the Court said, at page 257:

". . . In order to be entitled to such relief plaintiff had the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favored the granting of the injunction, *Set-O-Type Co. v. American Multigraph Co.*, 55 F.2d 800 (6th Cir., 1932). Probability of success on the trial must also be shown, *H. E. Fletcher Co. v. Rock of Ages Corp.*, 326 F.2d 13 (2d Cir., 1963)."

## —PLAINTIFF'S CLAIM OF TORTIOUS INTERFERENCE WITH CONTRACTUAL RIGHTS

■ In general, in order to maintain an action against a third person for interference it must be shown that the third person acted maliciously. 45 Am.Jur.2d Interference § 3. The elements essential to recovery for tortious interference with a contract are:

"(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." *Id.*, at § 39.

■ There has been no breach by defendant Bergey of his contract with the Cincinnati Bengals, nor will his performance be of less value to the Bengals. It follows from

that conclusion that there can be no recovery from the third person (the WFL) for tortious interference with Bergey's Bengals' contract, since procurement of the breach or, at least, substantial interference with its performance, is an essential element of the tort. *Cf., Law Research Service of Mo. Inc. v. Western Union Tel. Co.,* 336 F.Supp. 510 (E.D.Mo., 1971).

As Prosser points out, however, the term "malicious" is an "unhappy word" since it has come to have several shades of meaning, and the defendant's motive or purpose is frequently the determining factor in an action for interference with contractual relations:

> "In recent years . . . the real problem underlying the question of motive has emerged as one of balancing the conflicting interests of the parties, and determining whether the defendant's objective shall prevail at the expense of economic harm to the plaintiff." Prosser, *supra,* at 927–28.

Therefore, in order to give the problem the "complete analysis" that we have recognized it deserves, we consider plaintiff's case authority.

Primary reliance is placed by the Bengals on *Wear-Ever Aluminum, Inc. v. Towncraft Industries, Inc.,* 75 N.J.Super. 135, 182 A.2d 387 (1962). We think plaintiff's emphasis on certain language in *Wear-Ever* illustrates precisely the sort of retreat into "catchwords and rubber-stamp phrases," Prosser, *supra,* at 927, that we have taken pains to avoid throughout this litigation. It is certainly true that the *Wear-Ever* court was of the opinion that the relationships between the distributors and managers of the plaintiff company were the product of painstaking development and were of great value to the company. But to view in isolation the statement of the Court that "unjustified officious intermeddling with this legally obtained relationship must never have the judicial stamp of approval," 182 A.2d, at 393, is to distort the meaning of the case. It cannot be seriously suggested, much less contended, that the WFL defendants have engaged in conduct which even

approaches that of the defendant in *Wear-Ever.* There the plaintiff's district manager had been recruited by the defendant and, concealing that fact, used his position of trust and confidence while still an employee of plaintiff to organize covert meetings of the plaintiff's distributors in order to recruit them to defendant's sales force. That evidence is without parallel in the case at bar, and plaintiff's counsel conceded as much at final argument.

The same deceitful means that characterized the *Wear-Ever* case typifies plaintiff's other cases on this subject, *Architectural Mfg. Co. v. Airotec, Inc.,* 119 Ga.App. 245, 166 S.E.2d 744 (1969), and *Haggerty v. Burkey Mills, Inc.,* 211 F.Supp. 835 (E.D.N.Y., 1962). As the WFL defendants correctly summarize, the cases upon which plaintiff relies involve the use of highly egregious means in the inducement of the employees to terminate their employment.

There is no evidence whatsoever that the WFL has utilized such deceitful means. In other words, there is no evidence of legal malice. There is no evidence from which the Court can conclude that the WFL has singled out the Cincinnati Bengals as a target of destruction the accomplishment of which is through improper interference with the contracts between the Bengals and its players, nor that the WFL seeks to destroy the National Football League by its actions in signing NFL players to contracts for future services.

For the foregoing reasons, the Court reached the conclusion (No. 4) that plaintiff has not established a likelihood of success in its claim that it suffered a tortious interference with its right to full performance under Bergey's contract. The same holds true of the claim that plaintiff will suffer irreparable harm, unless an injunction issues, from interference with its contractual rights to Bob Johnson, *et al.*

No injunction can issue because of the absence of such likelihood of success on the plaintiff's substantive claim. It would therefore seem unnecessary to proceed to a discussion of the plaintiff's claim that unless an injunction issues it will be irrepara-

bly harmed and the companion claims that if an injunction does issue there will be an absence of substantial harm to the public interest, the defendants, or other parties. We deem it advisable to do so, however, in the interest of finality, *i. e.,* in case the plaintiff prevails on appeal on its substantive claim of tortious interference.

## —HARM TO PUBLIC INTEREST

▇ Next, we flesh out the bare-bones conclusion (No. 5, p. 19, *infra* ) that plaintiff has failed to show an absence of harm to the public interest if an injunction is granted herein. As we view it, the "public interest" within the meaning of that phrase as it is used here is the policy such as that behind the antitrust laws to encourage to the fullest extent practicable free and open competition in the marketplace. Restraints on competition are not favored. See, generally, 11 O.Jur.2d, Contracts, §§ 111–122.

This Court recognizes such public interest would probably not stand in the way of plaintiff's obtaining injunctive relief if it is able to establish that the contractual rights it has with its players have been tortiously, *i. e.,* maliciously interfered with (plus irreparable harm and no adequate remedy at law). On the facts of this case the Court cannot conclude that such interference as there may be was due to unfair competition. On the contrary, it seems to the Court that the threatened harm is due to competition, and an injunction would therefore not be in the public interest.

The Court would be blind if it did not recognize that there is a public interest of another sort. This is the concern among fans over the actual and prospective loss of key members of a team of which they are devoted followers and the effect this may have on that team's "chances." It is clear that the Court cannot take such "public interest" into consideration. The only public interest that can properly be taken into account is the policy of the law to encourage free competition in the marketplace. Hence, the denial of an injunction is not a case of the Court's turning its back on the fans and the owners of the plaintiff's fran-

chise, as the plaintiff improperly suggested in final argument that it might be.

## —HARM TO WFL AND PLAINTIFF

▇ Plaintiff has not demonstrated an absence of harm to the WFL defendants or "other persons." We consider the other persons the players, and are of the opinion that if an injunction is issued they will be harmed by the postponement of the time when there is bidding for their future services. Plaintiff concedes that the Bengal players have a First Amendment right to "talk" *now* to WFL teams about their future services. We are sure that the plaintiff also recognizes that the right of contract is not far behind. What the plaintiff contends, and the Court cannot accept, is that the signing before a player has performed his last game is a tortious interference with its contractual rights.

The conclusion about plaintiff's failure to establish absence of harm to the WFL defendants was based on the findings of fact, specifically No. 24. In connection with this conclusion and the one that the plaintiff failed to establish a clear case of irreparable injury to itself, the Court found of some interest the decision of the Court in *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462 (E.D.Pa., 1972), a case involving conflicting claims of an established league and a new league in professional major league hockey. For one thing the Court viewed the evidence "through a lens opened to the 'pragmatic factual approach' and set on the 'commercial realities' required by the antitrust laws." *Id.,* p. 514. It is no less interesting in its discussion of the superstar syndrome and the role of the less-than-superstar. *Id.,* p. 515. Also the harm to the NHL. *Id.,* pp. 516–17.

The Court notes the commercial realities start at the box office (515). The Court dwelt on the difference between irreparable harm which might be sustained by the emerging league and the established league. As to the emerging league the Court noted that the difference was that the loss to the emerging league:

" . . . might very well be the loss of any place in the gallery of major league professional hockey competition. While in contrast, if the NHL sustains a loss by the preliminary injunction here being granted, the NHL will still have both prominence *and* first place in this gallery, and even when losing, the diminution of its relative stature will be almost minor—a mere shadow far more calculable in precise damages and above all clearly not a destruction of the NHL's manifest first-place position." 351 F.Supp., at 514.

Of course, it is recognized that the *Philadelphia World Hockey Club, Inc.* ("Bobby Hull") case was antitrust litigation, and that the hockey reserve clause is allegedly much more severe than any option clause in the NFL player contracts. But the case nevertheless serves as a basis for comparison or has some value because of what it shows how one judge handled the issues of irreparable harm and adequate remedy at law in a conflict between established and emerging sports leagues.

■ The conclusion that plaintiff has not made a clear showing irreparable injury to itself is a difficult one to make. One reason is it is that there is nothing to go on because this case is unique. As pointed out by Coach Brown, in all his forty years:

"I've never had one like this, where I had a football player playing for me who is also under contract to somebody else." (Tr. Paul Brown, p. 72.)

For another, while it may be too late to close the barn door as far as Bergey and Chomyszak are concerned, the threatened damage from the loss of Bob Johnson, *et al.,* may not occur, and will not occur, if the Bengals match any offer they get from a WFL team. The Bengals argue that the fact that in order to match WFL offers they may have to tear up existing contracts and pay more for present services is evidence of irreparable injury.

We recognize that it will cost the Bengals something to bid for the future services of its players to preserve the continuity of the team's performance when present contracts expire. We do not, however, follow the argument that that is evidence of irreparable injury. Prior to the emergence of the World Football League, the teams in the National Football League could rest in relative assurance that the services of their players presently under short-term contracts would remain available beyond the termination dates should the clubs desire to offer players further contracts. The absence of a competitor league justified that self-assurance, for the NFL, until now, has been "the only game in town." With the rise of the WFL, the NFL can no longer rely upon the absence of a competitor for protection of its claims to the future services of players, for which the established teams have neither bargained nor paid consideration.

It is not the players' present services for which the clubs will have to pay more, for those are protected by contracts which can presumably be enforced in the usual manner. See, e. g., *Dallas Cowboys' Football Club, supra.* It is only when the NFL chooses (and such decision is likely) to join the competition for the later services of its players that it will incur these higher costs. In our best judgment, such higher costs will be attributable to competition and not unfair competition.

Yet another reason that plaintiff's irreparable injury has not been made clear is that testimony about the operation of the "forces" which will be at work as a result of key players being under contract to a competing team in a rival league in the future is that there has never been any trouble of that sort in the past when a player was playing out his option. In fact, Dave Lewis was observed to have had his best year when he was playing out his option and during the option year a new contract was negotiated for a higher amount both for the future and the option year.

We did find and took into account in making the conclusion that if five or six key Bengals are under contract for future services it is reasonably certain that the effect thereof will be adverse to the Bengals in the year in question.

We further recognized that the evidence shows that Bergey's trading value to NFL teams has been reduced and possibly destroyed. As noted herein, at least one NFL club (Philadelphia Eagles) was interested in Bergey before and lost interest because its coach has the same grave doubts the Bengals do as to the effect of the signing of Bergey on other players of any NFL team on which he might be playing.

## —BERGEY DID NOT BREACH

█ As far as the action against Bergey is concerned and the conclusion (No. 1) that Bergey has not breached his contract, the Court should add that not only has no promise been broken but there has been no anticipatory breach. As this implies, the Court concludes that Bergey did not "acquire an interest" in a WFL club nor agree to become an "instrument of publicity" of the Ambassadors as the plaintiff alleged. In addition, we know of no authority, and have been cited to none, for the Court to order rescission of the Bergey-WFL contract, even if some or all of the charges against Bergey had been established.

█ The case against Bergey has been considered, because, though not seriously pressed, it has not been abandoned. In that connection the Court took note of three rules of contract construction. One which needs no citation of authority is that a contract is construed most strongly against the person who prepared it, in this case the Bengals. Another rule of construction is that any agreement that limits a person's authority to follow his vocation must be strictly construed. See, e. g., Lemat Corporation v. Barry, 30 Cal.Rep. 240. See also, § 1209, Vol. 5A, Corbin on Contracts (1964). Finally, the same case is authority for the proposition that the contract here is one of "adhesion" and as such must be strictly construed against the Bengals. However, we do not reach any conclusion as to the legality, under the antitrust laws, of the contracts upon which the plaintiff relies. We do, however, question whether the parties could legally agree to a truce in their bidding war under which the WFL teams would agree not to sign any Bengal player until he has played his last game in his option year (if his option is exercised). It is the Court's view that if the parties enter into such an agreement it would at least be at the risk of exposure to liability under the antitrust laws. It is the Court's view further that it should not make an order which it is doubtful the parties can agree to, appealing as that might be.

That concludes the discussion of the reasons for the Court's holding plaintiff has not met the heavy burden that it has and the motion for temporary injunction had to be denied.

## APPENDIX

WORD FOOTBALL LEAGUE

| | | |
|---|---|---|
| (a) | Philadelphia World Football Club, Inc. Suite 1A5, The Philadelphia 2401 Pennsylvania Avenue Philadelphia, Pa., 19130 | Philadelphia |
| (b) | Alabama Football, Inc., an Alabama corporation, P. O. Box 2431 Birmingham, Alabama 35203 | Birmingham |
| (c) | Chicago Fire Football Club, Inc., a Delaware corporation, 1580 North Northwest Highway, Suite 5 Park Ridge, Illinois 60068 | Chicago |
| (d) | Detroit World Football Team, Inc., a Michigan corporation, Suite 803 Lafayette Building Detroit, Michigan 48266 | Detroit |

(e)  Jacksonville Sharks, Inc.,
    a Florida corporation,
    1245 East Adams Street
    Jacksonville, Florida 32202          Jacksonville

(f)  Texas World Football League, Inc.,
    a Texas corporation,
    Suite 510  2800 North Loop, W.
    Brook Hollow, Golden Center
    Houston, Texas 77018          Houston

(g) Southern California Professional Football, Inc.,
    a California corporation,
    2000 State College Boulevard
    Anaheim, California 92806          (Southern )
          (California)

(h)  Hawaii Professional Football, Inc.,
    a Hawaii corporation,
    Box 15607, Gold Bond Building
    233 Keawe Street
    Honolulu, Hawaii 96813          Hawaii

(i)  Washington Capitols, Inc.,
    a District of Columbia corporation,
    1129 20th St. N.W.
    Washington, D. C. 20036          Virginia

(j)  Toronto Northmen Football Team, Inc.,
    an Ontario Province corporation,
    50 Prince Arthur Street, Suite 204
    Toronto, Ontario M5RIB4          Toronto

(k)  Oregon Professional Football, Inc.,
    an Oregon corporation,
    401 S.W. 11th Street
    Portland, Oregon 97205          Portland

(l)  New York Pro-Grid, Inc., New York
    a New York corporation,
    415 Madison Avenue
    New York, New York 10017          New York